Okay, our one o'clock case is, excuse me, case number 4150779 P. P. B. Bright for the appellate. We have Maureen Williams for the appellate. Alison Paige Brooks is with us. Thank you, Justice. May it please the court, counsel. My name is Maureen Williams and I represent Dottie Bright in this matter. I come before this court to ask this court to correct a grave injustice that has occurred. If we look at the big picture involving this entire case, it started October 9th when Dottie gets in the car with a drunk driver, her boyfriend. She's forced to get in the car. He practically kills her when the accident occurs. She ends up with severe bodily injuries, mainly head injuries, in the right side of her body. She, when she's finally released from the hospital, she's the one charged with the DUI because he's no longer on this planet. They end up with an attorney that takes the last of the life savings only to spend the next four months, the entire four months that he represented her, telling them, telling Dottie she has to plead guilty. That's the extent of his preparation for the trial. The day after four months and no willingness to plead guilty, he gets Dottie and her mother into his office. He has a week before trial. He knows it's time to do it. He gets her in there. He's got Dottie in the room alone when the mother steps out and he finds the magic word to get Dottie to plead guilty. And he says, puts a chair up in front of her, faces her, they're both seated, and he says, if you don't take this plea, you will fry. She takes it to mean I'll be electrocuted. She doesn't know better. She only found out later when she was in prison that other women who have done other things that were worse than her alleged crime were not electrocuted. Well, counsel, she didn't become aware that she couldn't be electrocuted when she entered the plea of guilty and was completely admonished by Judge Resch? Well, Justice, she was not admonished as far as the... She was admonished as to the possible penalties, correct? She was not told what would happen if... She was only admonished regarding what she actually pled to. She was alerted to the possible penalties if this came back to life, if her plea was ever withdrawn. So she knew that there was a chance she could be tried for homicide, reckless homicide, but because she couldn't get the word fry out of her head... Correct. And what, was it just one count that was dismissed? Correct. And that was a lesser offense, is that correct? I believe it was the reckless homicide. Okay. It was the larger one. And so she didn't plead to that, so you're saying she thought she could be electrocuted for the reckless homicide if that came back? Correct. If she went to trial and lost. She heard the word fry, that's all she had to hear, and she shut down. Her mom didn't even know she was shutting down when she was driving her to the courthouse. Back to the, you know, just the big picture. Counsel, let me ask you this. With respect to the reckless homicide, wasn't she admonished when those charges were filed, when she appeared for arraignment? At that point, it's, I don't know the answer to that, but she had serious head injuries and she was not, at that time when she was first arraigned, I believe they found her unfit. It was later, a year later, I believe, where she, the Killian, Dr. Killian decided that she could go through it with a trial if she was, if she had an advocate, if she had someone by her side explaining things to her. Now let me ask you about that. I thought Dr. Killian basically said that she would be able to participate to the extent if she wanted to negotiate a disposition that she would need breaks if there were a trial, but if there was a negotiated disposition, I don't recall him mentioning needing an advocate there for a plea agreement. Yeah, it was part of his plea. Part of his report? I'm sorry, yeah, it was. I believe it was like the last, it's 839 of the appendix. She would likely have some difficulty keeping up in court during a trial and would be vulnerable to a vigorous cross-examination. However, these limitations would not keep her from negotiating a plea agreement through her attorney and accommodations. Frequent breaks and advocate could be provided at trial. The judge knew, she, about this report and he went forward with accepting the plea regardless. What was really an unjust move on the part of Attorney Wolf was when they got to the courthouse, he was talking to Dottie, she had shut down, she knew what she had to do. She had to plead in order to avoid being electrocuted. She knew what she had to do. Mother kept saying, what's going on, what's going on? His secretary said, you just shut up. They had words. Wolf didn't like that his secretary was spoken to that way and he had her banned from the courtroom, the mother. She was in another courtroom. Bailiff wouldn't let her leave until after the plea. And the judge at the post-conviction petition at the hearing said, well, that's not believable. It's not believable that she believes she would fry. But the proof is in the fact that, well, first of all, she went four months along with her family, her mother, her brother, saying, no, no plea. I'm going to trial. Even on the way to the courthouse after she had shut down, her brother had said, do not sign anything. You're going to trial. The proof that something happened to get her to all of a sudden want to plead proves that he said something. And the magic word was fry. He knew it when he said it and her eyes got big. She spooked. He even said to his secretary, isn't that right? She would fry. Another person, oh, absolutely. So then you look at the other thing that the judge did not believe, that she did not know what the word fry meant. Well, it's all of a sudden she's pleading because something spooked her. So let me, I want to clarify and make sure we're on the same page. So as to her plea of guilty, your position is that she was properly admonished, the judge followed the proper procedure, except that because she thought she was going to fry based on what her attorney told her, that's why the plea is not intelligent. Correct. It was not intelligently made. It might have been voluntarily made. She did not know the consequences of going to trial. She believed something that totally was not correct. The other thing, the mother in the courtroom, the other courtroom, Judge Resch did not believe that. But the proof is the plea went forward. If Mrs. Dellinger really was in the courtroom, we would not be here. It would have gone to trial. Mrs. Dellinger is cantankerous, as the record reveals. And she would have stopped this, but she was, she went out to make a phone call to her son, and at that time, when she tried to go back into the courtroom, that's when the bailiff had his arms folded, or I'm sorry, the wolf had his arms folded, pointing to the bailiff to come and get her, and the bailiff played along. And you mentioned that Judge Resch didn't believe that. Whose burden was it in front of Judge Resch to prove these matters? It's, all we can do is present it. Was it your burden? It was my burden. And what was your burden? To prove that the attorney failed. I mean, what is the actual standard, the burden, for post-conviction third stage? A constitutional violation. To prove that a constitutional violation did, in fact, occur. And so, with respect to her mother being held in another courtroom, the evidence that Judge Resch heard was that she couldn't even identify who that was, is that right? Well, I mean, that's correct. He, she had said all along, I don't know what he looked like. He was wearing a brown uniform. You know, this is the day her, she's trying to prevent her daughter from taking a plea, and she's supposed to be Was there any other evidence offered for anyone who happened to be in the courthouse who may have seen this, or observed the confrontation, or any part of this? Was anything like that offered for Judge Resch? No, there was nothing like that. I came on board much, I think a year after this occurred. I, I did, I thought the, I thought my client is credible, and the client's mother is credible. And so I didn't take steps, and it seems as if even the steps, had they been taken, it would not have mattered. The, the court had it in its mind that the defendant had to present a defense, and he said it was not, it did not happen. But my position is, defendant had, could just sit there. If she was allowed to go to trial, if she wasn't sandbagged and, and made to take this plea out of sheer fright, she could have had a jury, she could have had a right to testify, she could have had her relatives testify as to her habits, how she drove like an old lady, how, how Steve always had to drive drunk, without a license, too fast. She was denied that opportunity. He, the attorney had an obligation to investigate and come to a reasonable decision, and he did not. He did not do anything. He, he did not interview any of the witnesses. He did not prep any witnesses. He did not prepare any document. He prepared one document regarding the blood alcohol. He did not do one step towards a trial. So his back was up against the wall. He knew he had to get a plea, because he was not ready for trial. And former counsel did testify at the post-conviction hearing, correct? He did. And so Judge Resch basically had to make a credibility determination as to whether or not he believed former counsel or your client in her, her mother, is that correct, in her brother? He did. He, he believed, he believed this attorney or my client. And this is an attorney who did nothing to prepare for trial, who spent his entire time telling his client to plead guilty when they said, we're going to trial. If she would have sat through the trial like a bump on a log, she would have had a better result than what she went through. Because the evidence is circumstantial, there was no one that saw a driver. It was purely circumstantial. You could look at the bodies, you look at the evidence, you look at the medical records, the autopsy, the photos, the vehicle, you could look at all of it and say, this is a rollover. God only knows who was where, because no one had a seatbelt on. The evidence was there for him to look at, and he didn't look at it. He could have looked at, in addition to her habit of driving like a grandmother, his habit of always driving. The route that they, that she, that they were found, she never would have taken that route to go home. The autopsy had... What about this habit evidence? You're saying that would have been admissible? Had a trial, had there been one? I think he could have attempted to bring it in. If the, if, if this is circumstantial evidence and it rests on, is it likely that he was the driver? Then, you know, if he had a typical habit of driving that route, always driving her truck, it's, I believe it could have come in. The, there were two reports, one from the Illinois State Police, one from the travelers. The Illinois State Police did not come right out and say there was no rollover. They just failed to mention it. The travelers, which said there was a rollover, also identified your client as the driver, correct? But that's also taking into account that... Is that correct, counselor? That is correct, that is correct. But they also looked at what the state police had said. The state police report is already, is flimsy because the two persons that saw Dottie with her back against Steve, all the way on the passenger side, all of a sudden their names are not even in the Illinois State Police. But their, one testified at the post-conviction hearing and the other, his report was admitted as an exhibit, correct? That is correct. And they too both identified your client as the driver? They did not say that she was the driver. They were saying where she was positioned. One person said that her left foot was under the driver's pedal. But, you know, if she really was going to slide over in the middle of a, you know, if the state is so intent on saying there was no rollover, if she really was going to slide over, would she jump on top of Steve if he's way over? And the photos show this passenger seat was way over there. And if she's found on top of him with her back to his chest, and he's the one with the chest injuries, he's the one with the crushed thyroid, there is reasonable doubt for her, for a trial. Now they had to cut the steering wheel to get your client out, correct? That's what they say. But they also say only her lower extremities were found under it. So you don't believe they had to cut the steering wheel to get her out based on the record? Actually, I don't know what to believe, because I don't understand why they didn't take pictures of the persons in the vehicle before they were extracted. It would have taken two seconds. It would have shown everything that we needed to see. The photos support the conclusion that there was a rollover. And the state, if the state is so intent on saying there was no rollover, to me that tells me they know that if we can show there was a rollover, there's a highly unlikely chance that Dottie was driving. If she had flashbacks, she testified that those are the one thing, flashbacks are the only thing that I'm absolutely certain of. She has a flashback that she's on the floorboard right before the crash. She has a flashback that she crawled on top of Steve after this. Her attorney told her, no, you're lying. You were driving because you had a license. So the court did, in fact, believe Mr. Wolfe over Dottie, even considering the fact that there was no trial prep, no advocacy on the behalf of Wolfe. Mr. Wolfe stated that Dottie wrote in her notes that she was the driver. That's just blatantly wrong. She never wrote that. In fact, she wrote the opposite. This is a lawyer who goes to the jail after he locks the mother out of the courtroom, and he tells Dottie, I'm done with you. I'm not doing anything more for you because your mother insulted my secretary. But the judge believed this anyway, but Judge Resch also was incorrect in determining that Dottie had to present a defense. Dottie did not have to present a defense, just had to raise reasonable doubt. In conclusion, Dottie was denied effective assistance of counsel. Her rights to a jury trial, her rights to testify, her rights to present witnesses were taken from her. Mr. Wolfe decided she was going to plead guilty. He used undue influence to get her to that point. She was under duress when she entered the guilty plea. She did not enter it intelligently. She did not know that she could not be electrocuted. For these reasons, I would ask the court to grant relief to Dottie. Thank you. Thank you. You will have rebuttal. Ms. Brooks. Good afternoon, Your Honors. My name is Allison Paige Brooks, and I'm appearing on behalf of the people. May it please the court and counsel. First of all, as the state emphasizes, the standard review is deferential. In order to reverse the denial of the defendant's post-conviction petition has to be manifestly erroneous. And this is especially the case because the judge made credibility determinations following that evidentiary hearing. The state's position is that Defendant's Trial Counsel, Mervyn Wolfe, in fact gave effective advice for the defendant to plead guilty and secured her a favorable plea agreement of 15 years in prison when the maximum range was actually up to 28 years in prison for her Class II felony. It's a special penalty range. The facts of this case were very egregious against the defendant, and especially with Attorney Wolfe's experience with Judge Resch, decided that this was as good of a deal as the defendant could get after failing to negotiate it further down from the prosecutor and realizing that Judge Resch was likely to impose sentence in excess of 20 years, maybe as high as 26 in his estimation. And he also estimated that she was 99.99% likely to get convicted at a trial. And the state's position is that his view, his ascertainment of the case in those respects was eminently reasonable. He was entitled to look at the circumstantial evidence that he received in discovery as overwhelming, that the defendant was in fact driving and was responsible for these deaths, and that the defendant's claim that she might make at a trial to deny that she was driving and blame her passenger, Steve Doherty, for driving was incredible and would not be accepted by a trial in fact. So therefore, the defendant lacked a plausible defense, and that makes it, when this court has to view Attorney Wolfe's advice with deference to his experienced judgment, his advice was within the range of competence demanded of criminal attorneys, and should not be second-guessed. So also it's still not plausible for the defendant to try to say that it is a rollover situation, that the occupants had switched places because, first of all, the evidence is conflicting as to whether there's a rollover that had occurred. Sheriff Jerry Parsley had investigated the scene, determined through his own investigation, did not see evidence consistent with the rollover. So the defendant still has not presented any experts to show that it was possible for the occupants to have switched places and ended up in the positions in which they had ended up at after the collision to show that that would somehow support a defense. And I understand the defendant's point. They do not have a burden of putting on a case. They can simply stand on burden of proof. However, when their claim is ineffective decisions of counsel that they are claiming prejudice from, the likelihood of succeeding on the merits at a trial is a very relevant consideration. And if they present no case and just simply stand there with all the circumstantial evidence that she was driving, the fact that it was her car, the fact that she was the one who had insurance, and the circumstances of leaving, an underwear, a house that she thought was evil, late at night, and those circumstances certainly lends the high amounts of probability that she was, in fact, driving. To add that to what the investigation that Attorney Wolf secured, which is to talk to a medical expert, I believe was simply a nurse, but she knew enough about medicine to know that the massive amounts of extensive injuries suffered by Mr. Daugherty, including the flail chest, were indicative of him being on the passenger side at the point of impact. This is determined by the point of impact determined by Colquister's state police reconstruction report. In contrast, the defendant's, Ms. Bright's, injuries were not consistent, in the view of the medical expert, with having been at the point of impact. So, therefore, again, circumstantial, the fact that her legs were actually trapped under the steering wheel and the steering wheel had to be cut away in order for her to be extracted, again, very powerful evidence that would convince the charge of fact that no matter what she says, she must be lying because there's no way she could have been the passenger in that situation, based on the fact that she had been extracted from behind the steering wheel. So, all that just shows that she was given effective advice and secured a very good deal. Now that she seeks to undo that deal, she would face a maximum possible prison sentence of 28 years in prison. This was a case where three people died, and she had a very high alcohol level. She was on, also, I think, Seroquel and another psychoactive-type drug, so it was mixing alcohol, drinking with that, going 80 miles an hour, without stopping, at a state highway, hitting an ambulance, extremely egregious facts. Again, she got an extremely good deal by pleading guilty, and her counsel should be commended, should be commended for securing that deal for her. So, I'm not sure what about the photos show that there was a rollover. My recollection is that the parts of the truck had to be dismantled in order to extract the occupants, so photos that would have been taken after the occupant extraction would not be indicative of whether the cab of the pickup truck had, in fact, rolled over. Otherwise, the debris field was at the end of the skids. The truck was deposited straight in a concrete box culvert at the opposite end of the intersection. It does not seem to be facts, as Sheriff Parsley testified at the post-commission hearing, do not seem to be indicative of a rollover having occurred. So, for these reasons, the state requests the court to affirm the denial of the post-commission petition after the evidence from hearing. Thank you, Your Honors. Thank you. Is there any rebuttal? Your Honors, I just come back to one fact, even if it would not have been allowed into trial. The fact that they were found on that route when the person driving had to have accelerated 82 miles per hour in record speed because he knew when the stop sign was coming up. If we look at past behavior, like prosecutors and judges love to do, past behavior indicating future behavior, there is no way Dottie was the driver if we believe that she drives like a grandmother and that she went to his house without wanting to. She thought it was evil. She never would have returned to her house going that route. If this attorney would have realized that and listened to this family, he would have been convinced she was not driving because a grandmother does not drive like that. A grandmother does not go a certain route if she always went a different route. He had all sorts of evidence at his fingertips that he chose to ignore, and it was like a tennis match. Everything that came at him, he would say, no, it won't work, it won't work, it won't work, and he bought in completely to the state's position, which was just simply wrong. She was not driving. If there are no other questions, I will conclude. I see none. Thanks to both of you. The case is submitted, and the court will stand in recess. Thank you.